FILED

2019 Jun-24  PM 04:50
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| ANGELA KELLY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **CIVIL ACTION NO.** |
| v. | ) | |
| | ) | _____ |
| UNUM GROUP | ) | |
| CORPORATION f/k/a UNUM | ) | |
| PROVIDENT CORPORATION; | ) | |
| and UNUM LIFE INSURANCE | ) | |
| COMPANY OF AMERICA, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff Angela Kelly ("Plaintiff") brings this action for violations of the Employee Retirement Income Security Act of 1974 committed by Unum Group Corporation, f/k/a UnumProvident Corporation and Unum Life Insurance Company of America (collectively "Unum") relating to the provision of ERISA-governed disability benefits under the Tenet Employee Benefit Plan ("the Plan") sponsored by Tenet Healthcare Corporation ("Tenet"), which at all relevant times owned the Brookwood Baptist Medical Center Shelby Campus where Plaintiff had been

1

employed before becoming disabled.  In support of the relief requested herein, Plaintiff alleges the following upon personal knowledge as to herself and as to all other matters upon information and belief based upon, *inter alia*, the investigation made by and through her attorneys:

## INTRODUCTORY STATEMENT

1.   This is an action for legal and equitable relief seeking redress of violations of the Employee Retirement Income Security Act (hereinafter referred to as "ERISA").  This suit is brought pursuant to 29 U.S.C. § 1132(a), to secure disability benefits due to Plaintiff through an ERISA welfare benefit plan sponsored by Tenet and insured through a group insurance policy issued by Unum.

2.   The Plaintiff seeks any and all benefits to which she may be entitled should this Court determine she is "disabled" under the terms of the Plan, including specifically long-term disability benefits and any other benefits available through The Plan based on disability, including those similarly managed, administered or underwritten by Unum.

3.   Plaintiff seeks benefits based on the conditions documented in her medical records and other information before Unum.  Plaintiff's

2

disabling condition arises from mixed conductive and sensorineural hearing loss and bilateral eustachian salpingitis.

4.     These conditions leave her unable to hear and understand others' speech in any work environment having significant background noise, including specifically in an operating room environment where Plaintiff served as a staff nurse at Brookwood Baptist Medical Center Shelby Campus.

5.     Because Plaintiff is precluded by hearing loss from functioning in her "regular occupation" under the Unum policy as an operating room staff nurse, Unum's termination of her claim (after several months of approving and paying it) is wrongful and due to be overturned.

## JURISDICTION

6.     Jurisdiction is appropriate under 28 U.S.C. § 1331 in that 29 U.S.C. §1132(e) confers jurisdiction upon the district courts of the United States where, as here, Plaintiff's claims relate to an "employee welfare benefit plan" as that term is defined within 29 U.S.C. § 1001, et. seq. The Plan "may be found" within this district.

7.    Jurisdiction is further appropriate under 28 U.S.C. § 1332 in that the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and diversity of citizenship exists between the parties.

8.    Venue is appropriate in this District Court pursuant to 29 U.S.C. § 1132(e)(2), in that the employee welfare benefit plan at issue was at least partly administered in this District, the breaches of duty alleged herein occurred in this District, and the Defendant may be found or reside in this District and, pursuant to 28 U.S.C. § 1391(b), in that the cause of action arose in this District.

## PARTIES

9.    As of the filing of this Complaint, Plaintiff Angela Kelly is a resident citizen of Alabama and this District.

10.    Defendant Unum Group Corporation is a foreign corporation that does business by agent or otherwise in all counties in Alabama.

11.    Defendant Unum Group Corporation is a "fiduciary" of The Plan as that term is defined by 29 U.S.C. § 1002(21).

12.    One of Unum Group Corporation's designated agents for service of process is:

c/o Corporation Service Company, Inc.
641 South Lawrence Street

4

Montgomery, Alabama 36104

13.    Unum Group Corporation is an entity exercising authority or control respecting the management or disposition of The Plan assets or the personnel exercising said authority over The Plan assets.

14.    Unum Group Corporation is an entity providing services to The Plan at issue.

15.    Unum Group Corporation is an entity meeting ERISA's definition of a "party in interest" in this case as that term is defined by 29 U.S.C. § 1002(14).

16.    Defendant Unum Life Insurance Company of America is a foreign corporation that does business by agent or otherwise in all counties in Alabama.

17.    Unum Life Insurance Company of America is a "fiduciary" of The Plan as that term is defined by 29 U.S.C. § 1002(21).

18.    One of Unum Life Insurance Company of America's designated agents for service of process is:

> c/o Corporation Service Company, Inc.
> 641 South Lawrence Street
> Montgomery, Alabama 36104

19.   Unum Life Insurance Company of America is an entity exercising authority or control respecting the management or disposition of The Plan assets or the personnel exercising said authority over The Plan assets.

20.   Unum Life Insurance Company of America is an entity providing services to The Plan at issue.

21.   Unum Life Insurance Company of America is an entity meeting ERISA's definition of a "party in interest" in this case as that term is defined by 29 U.S.C. § 1002(14).

22.   Unum Life Insurance Company of America contracted with or presently has a contract for services with Defendant Unum Group Corporation, where Unum Group Corporation performs administrative functions for the Plan.

23.   Unum Life Insurance Company of America relies on employees provided through Unum Group Corporation for administrative functions for the Plan at issue.

## THE PLAN

24.   Upon information and belief, The Plan at issue was funded, at least in part, by a long-term disability insurance policy sold by Unum

6

Life Insurance Company of America, the company which also underwrote the policy.

25.     This long-term disability policy was purchased by Plaintiff's employer for the purpose of conferring a benefit upon Plaintiff and other employees.

26.     As a result, this policy qualifies as an employee welfare benefit plan as defined in 29 U.S.C. § 1002(1), and Plaintiff qualifies as a participant and/or beneficiary under The Plan as that term is used in 29 U.S.C. § 1132.

27.     At the time of Unum's termination of her LTD benefit, the definition of disability governing her claim required that she be "limited from performing the material and substantial duties of [her] regular occupation do to [her] sickness or injury" and that she "have a 20% or more loss in [her] indexed monthly earnings due to the same sickness or injury."

28.     The policy defines "regular occupation" as being the occupation "you are routinely performing when your disability begins" and as that occupation is performed within the national economy.

7

29.   Under the terms of The Plan providing for disability benefits, Plaintiff is "disabled" as defined by The Plan.

30.   On information and belief, although the Plan purports to confer discretion to Unum Life Insurance Company of America, the Plan is expressly governed by Texas law which voids such clauses in group disability policies.   Accordingly, the Court's review of Unum's benefit determination is to be conducted under a *de novo* review standard.

31.   However, even if the law of another state applied, the discretionary clause would have no impact on this case because the employees that administered Plaintiff's claim either were employed by a different entity or acted under the direction or control of Unum Group Corporation pursuant to a general services agreement, notwithstanding them having presented themselves to Plaintiff as employees of Unum Life Insurance Company of America.

### UNUM'S LIABILITY

32.   Angela Kelly has spent her entire working life in nursing.  In 2007, she re-joined Brookwood Baptist Medical Center Shelby Campus (after initially working there between 2000 and 2004) as a clinical/operating room nurse whose substantial and material duties

8

included assisting with operations and similar invasive medical procedures.

33.   On or around February 2018, Plaintiff, who had a long history of ear infections and related issues, found her hearing difficulties to have increased to the point where she could no longer discern what others were saying in environments having ambient noise, which in her line of work included any place where she was among the staff assembled to perform a procedure or operation.

34.   Her impaired hearing would have put patients at risk because she could not hear or accurately understand instructions or information communicated in such environments.  She also could not hear or accurately understand instructions communicated to her by doctors wearing surgical masks.  Because of these things, she had to leave a calling she had long loved.

35.   After becoming unable to continue working, Plaintiff applied for short term disability benefits under the Plan.  She was promptly found disabled under that Plan by Unum and received the maximum benefit for the policy's entire duration, or until August 26, 2018.

36.   As part of Unum's review of her STD claim, Pamela Pfeifer, a Unum RN, found Plaintiff's medical evidence to support a "lack of predictable hearing through STD max date."

37.   Nurse Pfeiffer had also found in an earlier review leading up to that point that Plaintiff's documented hearing tests showed a severe loss of hearing in her left ear affecting Plaintiff's ability to hear accurately conversational speech, an issue she likewise noted that hearing aids could not mitigate.

38.   Further, Plaintiff's attending physician confirmed to Unum that Plaintiff's hearing loss was permanent and seriously detrimental to her ability to perform a job (that as a doctor he was obviously familiar with) which required her to be timely and accurate.

39.   When the STD benefit was exhausted, Plaintiff's benefit transitioned to the LTD plan at issue in this case that, like the STD plan, was also administered by Unum.

40.   In internal claim notes, those responsible for Plaintiff's LTD claim at that time noted Plaintiff to continue to be disabled from performing her regular occupation and approved her LTD benefit on

August 8, 2018 upon finding her to be disabled under the terms of the Plan.

41.   The next day, Plaintiff's attending physician sent Unum assessment information indicating that he expected Plaintiff's hearing to worsen, not improve, and that her worsening hearing loss would be permanent.

42.   Although his report on Plaintiff's condition remained consistently the same, in November 2018 a different Unum nurse reviewer -- Shannon Pitula, RN, BSN – made a sharply different assessment based on the *same information* found just three months earlier by Unum to support Plaintiff being disabled.

43.   In that assessment, Nurse Pitula expressed doubt about Plaintiff's condition and labeled the medical evidence before Unum as being "inconsistent," even though the medical evidence did not ever change.

44.   After Nurse Pitula made her note in the claim record, Plaintiff's claim was channeled to an internal Unum-employed physician reviewer, Dr. Steven Leverett.

45.   Dr. Leverett sent a letter to Plaintiff's attending physician expressing doubt as to Plaintiff being disabled because she demonstrated an ability to hear and understand Unum's claims personnel in telephone conversations.

46.   Plaintiff's attending physician acknowledged that Plaintiff likely could hear and understand such conversations, but that Dr. Leverett's observation missed the real issue, which is the impact of Plaintiff's loss of hearing when she is in a surgical environment where doctors have masks and there is a persistent level of ambient noise that cannot be avoided.  He wrote in a letter back to Dr. Leverett, "I do continue to feel that her underlying sensorineural hearing loss is aggravated frequently enough by her chronic Eustachian salpingitis and otitis media that it significantly impacts her ability to adequately and safely perform her primary functions as an Operating Room Circulating Nurse."

47.   Following this exchange, Unum physician reviewer Dr. Kouros adopted Nurse Pitula's write-up of Plaintiff's condition entirely and in every instance credited her opinions over the records, assessments and opinions of Plaintiff's treating physician and over the

opinions of the prior reviewers for Plaintiff's claim who three months earlier found the same body of evidence to support her being disabled under Plan terms.

48.   This in turn was *also* adopted by Dr. Sharon Hogan, a Unum medical officer, with little discussion or expression of consideration given to the earlier favorable reviews or to the records, assessments and opinions of Plaintiff's attending physician.

49.   With Unum's reversal now hardened against the Plaintiff after three months of paying benefits, Unum informed Plaintiff in a letter dated December 6, 2018 that it was terminating and closing her claim based on its re-review of her medical information.

50.   Plaintiff, on her own and without assistance from counsel, appealed the termination of her benefit in writing on January 17, 2019, noting the patent error in statements Unum had made about the state of her hearing and the difficulties she experiences.

51.   In a statement dated January 21, 2019, Plaintiff's attending physician confirmed in writing everything Plaintiff had told Unum in her appeal letter, stating:

Her most recent appointment was 12/27/2018, where she had a followup audiogram. This showed essentially stable hearing from January 2018, still with a mixed component. Her PE tubes continue to be in place and patent. She has not had any significant acute infections or drainage requiring medical attention, but she relates ongoing symptomatic fluctuations of pressure and plugging related to her underlying Eustachian tube dysfunction, with an associated fluctuating impact on her hearing.

Speech discrimination remains 100% in the sound booth, but she relates frustration that she is having increasing difficulty understanding conversations out in the world. For example, she frequently misunderstands conventional phone conversations and is becoming reliant on the Bluetooth connection from her smartphone to her hearing aids.

It remains my opinion that her hearing loss jeopardizes the safe execution of duties and patient care required of a Registered Nurse, and that her claim of disability warrants continued evaluation. I appreciate your time and assistance in the care of Ms. Kelly.

52.  Unum physician reviewer Dr. Scott Norris discounted the statement, stating essentially again what others before her had done, which is that that Nurse Pitula's "observations" disproved Plaintiff's claim. Interestingly, his review similarly cites medical records that pre-date Unum's August 2018 disability determination and relies on them to reach a completely different conclusion than that which Unum had reached when the claim began.

53.  In a letter dated March 6, 2019, Unum informed Plaintiff that her appeal was denied.

54.  After the denial of her appeal, Plaintiff retained undersigned counsel which issued a request to Unum seeking all "relevant" documents as that term is defined in Department of Labor Regulations governing adverse ERISA benefit determinations.

55.  Documents provided since the denial establish numerous

breaches and errors committed by Unum while administering Plaintiff's claim, including:

(a) The targeting of Plaintiff's claim for denial because ERISA governs;

(b) The failure by UnumProvident to take any meaningful measures to insulate its claims process from its inherent conflict under the Supreme Court case *Glenn v. MetLife* and instead allowing its profit motive to influence its claims administration for Plaintiff;

(c) Depriving Plaintiff of the ability to obtain a full and fair review of her claim;

(d) Taking an adversarial posture against Plaintiff instead of a fiduciary posture by searching for ways to avoid paying part or all of her claim;

(e) Failing to conduct an adequate investigation, and not considering and/or according proper weight to relevant, supportive information;

(f) Failing to accord any weight to Plaintiff's medical providers who personally examined the Plaintiff on a regular basis;

(g) Purposefully limiting and curtailing the review of its medical consultants and otherwise improperly exerting influence on them to opine against payment of benefits;

(h) Unreasonably and arbitrarily overruling the professionals who personally examined Plaintiff; ; and

(i) Unreasonably and arbitrarily overruling *its own* prior determinations that Plaintiff was permanently disabled without there being medical evidence of substantial medical improvement in Plaintiff's conditions.

56.   As set forth above regarding Unum's fiduciary breaches, Unum's claim decision was the product of a conflict of interest whereby it allowed its own financial interests to supersede its fiduciary obligations to Plaintiff.

57.   Employees who were responsible for the administration of Plaintiff's claim for benefits are eligible to receive bonuses and awards based at least in part on company profitability.

58.   Further, employees who had supervisory involvement and authority over Plaintiff's claims process participate in Unum Group Corporation's management incentive compensation program.

59.   Employees involved in the administration of Plaintiff's claim also participate in Unum Group Corporation's performance recognition program.

60.   To receive bonuses or awards under either the management incentive program or the performance recognition program, Unum Group employees must meet certain criteria.

61.   Satisfaction of the eligibility criteria for these programs is impacted at least in part by the denial and/or closure of claims like Plaintiff's.

62.   Unum's history of abusive claims practices reaches back for many years and includes documented policies of instructing, encouraging or incentivizing employees responsible for claims administration to deny claims, especially when that claim is found likely to be subject to ERISA.

63.   This strategy finds its inception in what has become known as the LeBeouf Report.

17

64.   The LeBeouf Report and internal documents relating to the same established a strategic approach that included an "ERISA Task Force" created by Unum for the implementation of standardized claims practices that encouraged employees to consider the applicability of ERISA during the administrative process and then to target such claims for potential denial to "take advantage of ERISA protection."

65.   In an October 2, 1995 memorandum, Unum management-level employee Jeff McCall assessed the opportunities afforded by ERISA's application to aggressive handling of claims as follows:

> The advantages of ERISA coverage in litigious situations are enormous; state law is preempted by federal law, there are no jury trials, there are no compensatory or punitive damages, relief is usually limited to the amount of the benefit in question, and claims administrators may receive a deferential standard of review.  The economic impact on Provident from having policies covered by ERISA could be significant.  As an example, Glenn Felton identified 12 claim situations where we settled for $7.8 million in the aggregate.  If these 12 cases had been covered by ERISA, our liability would have been between zero and $0.5 million.

> The key for determining the applicability of ERISA is whether or not the employer "sponsors" or "endorses" the plan.  If the employer pays the premium, the policy would usually, but not always, be considered to be governed by ERISA.   Salary allotment or payroll deduction arrangements, by themselves, do not necessarily mean that a policy is subject to ERISA. While our objective is to pay all valid claims and deny invalid claims, there are gray areas, and ERISA applicability may

influence our course of action.

66.    Between 2002 and 2004, Unum was subjected to investigation by several state departments of insurance.  The announced purpose of that investigation was "to determine if the disability income claims handling practices of [Unum] reflected systemic 'unfair claim settlement practices'" in violation of various state insurance laws.

67.    Upon completion of the investigation, examiners found many abuses, including unfair construction of evidence and evidentiary or contractual requirements for proving entitlement to benefits.

68.    After completion of this multi-state investigation in November 2004, Unum entered into a Regulatory Settlement Agreement ("RSA") whose terms required it to pay a substantial fine and to amend its claims practices.

69.    Unum, however, did not faithfully comply with the terms of the agreement, and instead engaged in an effort to better camouflage its pre-RSA claims practices.

70.    Not long after its execution of the RSA, Unum instructed its employees to continue to decide claims as they had done previously,

notwithstanding Unum's forthcoming revision of its claims procedures to satisfy any future inspectors.

71.   As part of this resumption of its pre-RSA activities, Unum continued its incentivization programs aimed at closing claims and obtaining "recoveries" for Unum in the form of released reserves.

72.   Unum employees at the claim administration level continued to take part in a company bonus system and award program tied to company profitability.

73.   Unum employees at the claims level also continued to be evaluated on a regular basis for their efforts to achieve goals connected to the enhancement of corporate profits.

74.   As set forth above, to receive bonuses or awards under either the management incentive program or the performance recognition program, Unum Group employees must meet certain criteria.

75.   Satisfaction of the eligibility criteria for these programs is impacted at least in part by the denial and/or closure of claims like Plaintiff's.

76.   Unum's "Manager Toolkit" shows metrics included within these criteria involve claim closure or termination numbers, liability

acceptance rates, and claim reopen rates.

77.   These values, individually or in the aggregate, may influence the award of performance compensation or consideration of corporate advancement opportunities.

78.   Unum even explicitly directs its management employees to filter information to those reporting to them so their interests likewise justify with those of the overall company.

79.   As Unum's documents make clear, the more an individual or unit is perceived as contributing to the meeting of Unum's financial goals, the greater their share of the bonus pool.

80.   Unum also actively tracks the pursuit of goals for closing claims or recovering or conserving reserves on a regular basis and consistent basis through Weekly Tracking Sheets.

81.   According to Unum's claims procedures pertaining to IDI milestone reviews, these goal documents are made available to the claim directors, the very individuals charged with deciding whether claims will be approved or denied and whether open claims will be terminated.

82.   Unum also uses a "balanced business scorecard" approach at the director level to ensure claims personnel remain informed throughout the year on whether the company is meeting the financial goals necessary for the availability of bonus or incentive compensation.

83.   These scorecards are among those documents evidencing the continuation of Unum's earlier pre-RSA claims practices; other Unum documents have also specifically referenced goals, expectations, projections and targets for closures.

84.   This active conflict of interest under which Unum employees operate further calls into question the credibility of Unum's claims personnel and reviewers, such that no deference to the decision made here should be accorded.

85.   Unum considered the applicability of ERISA before making its decision.  This presents an additional reason for application of a *de novo* standard to their claim decision, and to excuse the Plaintiff from further utilization of Unum's claim process.

86.   Unum did not provide Plaintiff with a meaningful opportunity for a full and fair review of her claim for benefits as required by 29 U.S.C. § 1133 and 29 C.F.R. 2560.503-1.

87.   Unum's decision process has not comported with 29 U.S.C. § 1133's requirement that any notice of the denial must contain the specific reasons for such denial, written in a manner calculated to be understood by the participant, and must comport with Department of Labor regulations.

88.   Plaintiff has exhausted all Plan remedies even though Unum's failure to adhere to Plan terms or ERISA requirements and regulations did not require it.  As such, this case is ripe for judicial review.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Angela Kelly respectfully requests this court find jurisdiction and venue appropriate, and after trial, grant the following relief:

a.   For an order awarding Plaintiff all benefits due and owing in accordance with the terms of the Plan and Policy, as well as all prejudgment interest due thereon as permitted by law and equitable principles, pursuant to 29 U.S.C. § 1132(a);

b.   For a judgment against the Defendant awarding Plaintiff prejudgment interest, costs and expenses, including the reasonable

attorney's fee as permitted under 29 U.S.C. § 1132(g)(1) upon the award of benefits and other appropriate reliefs under Plaintiff's LTD plan herein;

c.      For an order requiring Defendant to provide Plaintiff with any additional benefits to which Plaintiff would be entitled pursuant to a finding that the Plaintiff is disabled under The Plan; and

d.      Such other relief as may be deemed just and proper.

Respectfully submitted,

M. Clayborn Williams
(ASB-9101-A43M)

**The Martin Law Group, LLC**
**Attorneys for Plaintiff**
P.O. Box 20087
Tuscaloosa, AL 35402-0087
Phone (205) 343-1771
Facsimile (205) 343-1781
clay@erisacase.com

**Plaintiff's Address:**

Angela Kelly
c/o The Martin Law Group, LLC
P.O. Box 20087
Tuscaloosa, AL 35402

**Defendants' Address:**

Unum Group Corporation
c/o Corporation Service Company, Inc.
641 South Lawrence Street
Montgomery, Alabama 36104

Unum Life Insurance Company of America
c/o Corporation Service Company, Inc.
641 South Lawrence Street
Montgomery, Alabama 36104